**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

QUALITOX LABORATORIES, LLC dba
Three Rivers Diagnostics,

      Plaintiff,

v.

MEDAIR LABS, LLC,

      Defendant.

CIVIL DIVISION

CASE NO.   2:23-cv-1188

JURY TRIAL DEMANDED

## COMPLAINT

AND NOW comes Plaintiff, Qualitox Laboratories, LLC dba Three Rivers Diagnostics ("Three Rivers") by and through its undersigned counsel, BURNS WHITE LLC, Mary-Jo Rebelo, Esquire and Kenneth N. Schott III, Esquire, and hereby files the within COMPLAINT averring as follows:

### PARTIES

1.    Plaintiff, Three Rivers, is a Pennsylvania Limited Liability Company with a registered address of 1548 Glenn Way, McKees Rocks, Pennsylvania 15136.

2.    Upon knowledge, information and belief, Defendant, MedAir Labs, LLC ("MedAir") is an Ohio limited liability company with a registered address of 75 East Market Street, Akron, Ohio 44308.

3.    Upon knowledge, information and belief, MedAir's principal place of business is located at 10300 Antenucci Blvd 203, Garfield Heights, Ohio 44125.

**JURISDICTION AND VENUE**

4.     Jurisdiction over MedAir is proper, because MedAir reached into Pennsylvania to form a business relationship with Three Rivers such that MedAir has sufficient minimum contacts with the forum state.

5.     Complete diversity exists between the parties and the amount of Three Rivers' damages are likely in excess of the jurisdictional threshold (i.e., are greater than $75,000.00).  28 U.S.C. § 1332.

6.     Venue is appropriate in the Western District of Pennsylvania, because a substantial part of the events giving rise to Three Rivers' claims occurred in Pittsburgh, Pennsylvania.  28 U.S.C. § 1391.

**STATEMENT OF FACTS**

**A. The Origins of Three Rivers' Relationship with MedAir**

7.     Three Rivers is a full-service clinical reference laboratory based in Pittsburgh, Pennsylvania.

8.     Three Rivers has been in business since 2015.

9.     Up until December, 2022, Three Rivers never participated in providing at home COVID-19 test kits through the Medicare COVID-19 OTC program (hereinafter the "Medicare Program") to eligible Medicare beneficiaries.

10.     Three Rivers was first introduced, by MedAir, to the idea and reimbursement model for providing at home COVID-19 test kits to eligible beneficiaries through the Medicare Program specifically.

11.     Upon knowledge, information and belief, MedAir is a company that was specifically formed as a result of the COVID-19 pandemic.

12.     MedAir, *inter alia*, offers to provide business and administrative services to laboratories like Three Rivers for the purpose of obtaining Medicare beneficiaries whom opted to receive COVID-19 test kits and facilitating delivery of those COVID-19 test kits to Medicare eligible recipients who opted into the Medicare Program.

13.     Three Rivers was introduced to MedAir by Catalyst RCM, a company that provides laboratory billing services to Three Rivers.

14.     Three Rivers had a longstanding relationship with Catalyst RCM and trusted its recommendation to work with MedAir.

15.     Furthering its trust in working with MedAir, a former Medicare investigator by the name of Chad Walker, who now works in the private sector as a consultant to labs regarding Medicare reimbursement, recommended MedAir to Catalyst RCM, who in turn passed this recommendation along to Three Rivers for purposes of participating in the Medicare Program for the first time.

16.     Catalyst RCM first reached out to Three Rivers about the possibility of collaborating with MedAir and relative to the Medicare Program in or about late November 2022.

17.     Three Rivers' initial meeting with MedAir for the purpose of discussing the parties' joint participation in the Medicare Program occurred in or about early December 2022.

18.     Three Rivers discussed the Medicare Program with MedAir and Catalyst RCM at length, specifically how the parties would ensure they were in compliance with the Centers for Medicare and Medicaid Compliance's ("CMS") requirements for program participation, billing and reimbursement.

3

19.     Three Rivers had no prior experience with the Medicare Program and wanted to make sure it was partnering with vendors and subcontractors who would execute the Medicare Program compliantly.

**B. MedAir's Representations and Express Warranties Made Prior to Contracting**

20.     MedAir assured Three Rivers that the business and administrative services it proposed to offer satisfied CMS standards, but further represented MedAir needed a laboratory partner (like Three Rivers) as the billing party in order to execute MedAir's program plan as MedAir is not an entity that has a Provider Transaction Access Number ("PTAN") to bill Medicare.

21.     Prior to working with Three Rivers, MedAir had billed for its participation in the Medicare Program through its principal's (i.e., A. William Kedia, MD or "Doctor Kedia") family practice.

22.     MedAir misrepresented to Three Rivers that Doctor Kedia was put on a "medical record review," because Doctor Kedia's family practice had such a small Medicare billing history.

23.     In reality, Doctor Kedia was suspended from receiving reimbursements from Medicare due to MedAir's billing misconduct and, therefore, MedAir needed a laboratory partner like Three Rivers to get around this suspension.

24.     MedAir further represented to Three Rivers that it engaged independent counsel (i.e., the law firm of Baker Hostetler) to review the professional services model MedAir offered to Three Rivers and that this model, as outlined by MedAir, satisfied CMS standards.

25.     More specifically, MedAir represented that Baker Hostetler prepared a legal memorandum that would serve as the template and guide in executing MedAir's program plan and the parties' compliant participation in the Medicare Program.

26.     Upon knowledge, information and belief, the initial part of MedAir's program plan was actually performed by MedAir's vendor and/or subcontractor, IMDS, LLC ("IMDS").

27.     IMDS created a protocol that included several layers of certification to ensure Medicare beneficiaries had properly opted into the Medicare Program before a COVID-19 test kit would be ordered, billed for and/or delivered to recipients.

28.     The protocol was also designed to eliminate beneficiaries that had entered a supervised living care facility, remove any beneficiary who had entered the Medicare Program already, and confirm that the beneficiaries were enrolled in Medicare Part B.

29.     The IMDS protocol required that the datasets of beneficiaries would be scrubbed to remove any deceased beneficiaries from the call list.

30.     Upon knowledge, information and belief, it is Three Rivers' understanding that IMDS was engaged by MedAir to conduct the outreach process to beneficiaries but not the screening process to remove ineligible beneficiaries from the datasets.

31.     It is also Three Rivers' understanding and belief that the responsibility to remove ineligible beneficiaries (including any deceased beneficiaries) from the datasets belonged at all relevant times to MedAir under the IMDS-MedAir contract.

32.     While Three Rivers did not learn about IMDS' participation in the initial outreach process until after the fact, MedAir assured Three Rivers up front that any

ineligible beneficiaries and/or deceased beneficiaries would be removed from the datasets prior to sending the final datasets to Catalyst RCM for billing.

33.     Additionally, MedAir specifically represented to Three Rivers that the initial outreach process would involve phone calls to beneficiaries during which the beneficiaries had to affirmatively opt-into the Medicare Program to receive COVID-19 test kits.

34.     As Three Rivers later discovered, the phone script used by MedAir and/or IMDS was a digital recording and only gave beneficiaries the ability to opt-out of the Medicare Program but, if they failed to opt-out during the call, beneficiaries were automatically opted into the Medicare Program.

35.     Three Rivers has made every effort to confirm the contractual rights and obligations between IMDS and MedAir specifically asking MedAir for a copy of its agreement with IMDS.

36.     MedAir has not provided a copy of the IMDS-MedAir agreement to Three Rivers as requested.

37.     MedAir's failure to produce a copy of the IMDS-MedAir agreement leads Three Rivers to believe that it was MedAir's responsibility under this agreement to scrub the datasets of any ineligible and/or deceased beneficiaries.

38.     Three Rivers reserves the right to amend this Complaint upon receipt of the IMDS-MedAir agreement in discovery to assert any other relevant facts and/or any viable claims it may have as a result of the IMDS-MedAir agreement, including but not limited to, any applicable intended third-party beneficiary contract theories.

**C. Three Rivers and MedAir Orally Agree to Work Together and Begin Participating in the Medicare Program Prior to Reducing their Engagement to Writing**

39. Three Rivers considered MedAir's offer for participation in the Medicare Program as outlined above including but not limited to MedAir's specific assurances that its program plan had been vetted by MedAir's counsel as compliant with the Medicare Program.

40. It was Three Rivers' understanding at the time of contracting that MedAir would: (1) strictly follow the protocol outlined above, and (2) scrub the datasets of any ineligible or deceased beneficiaries prior to sending the final datasets to Catalyst RCM for billing.

41. It was Three Rivers' understanding at the time of contracting that MedAir would only include those eligible beneficiaries in the final datasets who specifically opted into the Medicare Program.

42. Three Rivers accepted MedAir's oral offer to provide business and administrative services to Three Rivers as part of its participation in the Medicare Program and consistent with Three Rivers' understanding at the time of contracting as outlined above.

43. No written contract was executed by the parties prior to the start of program implementation.

44. MedAir began the initial outreach process and started shipping COVID-19 test kits to beneficiaries during the November 2022 to early December 2022 timeframe even though billing for November and December 2022 shipments did not begin until January 1, 2023.

45.     Indeed, prior to the parties' initial meeting in early December 2022, MedAir had a back log of shipped COVID-19 test kits representative of outreach conducted in November 2022 and for which MedAir needed a billing partner to receive reimbursement from Medicare.

46.     Accordingly, the parties contemplated billing Medicare through Three Rivers' provider agreement for both outreach already performed and related to outreach to Medicare eligible beneficiaries to be performed going forward as part of their oral agreement.

47.     Three Rivers and MedAir did not attempt to reduce their agreement to writing until late December or on or about December 23, 2022.

**D. (1) Three Rivers' and MedAir's Course of Performance of their Oral Agreement Beginning on or About Early December, 2022, and (2) MedAir's Performance of its Related Agreement with Three Rivers' Billing Vendor – i.e., Catalyst RCM**

48.     Upon knowledge, information and belief, IMDS performed the initial outreach to potentially eligible beneficiaries in part using artificial intelligence ("AI") or robot calling to communicate with beneficiaries.

49.     IMDS would thereafter create initial datasets based upon its outreach efforts and provide the same to MedAir, who was then supposed to scrub the datasets of any ineligible or deceased beneficiaries.

50.     If beneficiaries were confirmed eligible and did not opt out of receiving the test kits through the phone script, MedAir would then acquire and ship COVID-19 test kits to those beneficiaries.

51.     Upon confirmation the test kits were received by eligible beneficiaries, MedAir would then supply a final list(s) of test kit recipients to Three Rivers and Catalyst RCM for final billing by Catalyst RCM.

8

52.     MedAir's written contract with Catalyst RCM required MedAir to deliver final list(s) of test kit recipients to Catalyst RCM containing true and accurate information and that are compliant with all applicable laws and regulations.

53.     MedAir further promised to indemnify Catalyst RCM for any liability, losses, costs, fees or expenses related to the delivery of the final list(s) of test kit recipients and caused by the content or inaccuracy of the information so delivered, including with respect to any false claims.

54.     The effective date of MedAir's and Catalyst RCM's written agreement (the "MedAir-Catalyst RCM Contract") is October 14, 2022.

55.     Upon knowledge, information and belief, Catalyst RCM began performing its billing responsibilities under the MedAir-Catalyst RCM Contract and in support of Three Rivers' participation in the Medicare Program on or about January 1, 2023.

56.     Upon knowledge, information and belief, MedAir began performing its contractual obligations by supplying final lists of test kit recipients to Catalyst RCM for billing purposes prior to January 1, 2023.

57.     Using the final list of test kit recipients provided by MedAir, Catalyst RCM billed on behalf of Three Rivers for the delivered COVID-19 test kits.

58.     After Catalyst RCM billed for the delivered test kits, Three Rivers would receive reimbursement from the Medicare Program.

59.     Three Rivers then paid MedAir $85.68 per group of eight (8) test kits consistent with the oral agreement between Three Rivers and MedAir.

60. Upon knowledge, information and belief, MedAir's agreements with Catalyst RCM, IMDS and other procurement vendors obligated MedAir to pay these vendors for their efforts in connection with the Medicare Program collaboration.

**E. MedAir Breaches its Agreements with Three Rivers and Catalyst RCM**

61. MedAir failed to properly scrub the submitted datasets of all deceased beneficiaries.

62. It has come to Three Rivers' attention that almost 3,000 deceased Medicare beneficiaries were included in the datasets submitted by MedAir during the timeframe of November 1, 2022 through January 24, 2023.

63. On February 2, 2023, Three Rivers received notice from CMS that its Medicare payments have been suspended in their entirety and for all lab services provided by Three Rivers, not just for its participation in the Medicare Program.

64. Three Rivers' Medicare suspension specifically relates to billing the Medicare program for COVID-19 OTC test kits after the date of death of almost 3,000 deceased beneficiaries.

**F. Three Rivers has Incurred Extensive Pecuniary Damages as a Consequence of MedAir's Failure to Properly Scrub the Datasets**

65. MedAir's failure to perform its contractual obligations as promised is the direct and proximate cause of Three Rivers' suspension from Medicare payments.

66. Prior to its suspension, Three Rivers received annual payments from Medicare in excess of seven million dollars ($7,000,000.00) per year through its provision of lab services to Medicare beneficiaries, exclusive of Three Rivers' participation in the provision of COVID-19 test kits through the Medicare Program.

67.     Three Rivers' inability to receive reimbursement from Medicare for lab services to eligible beneficiaries has resulted in significant pecuniary damages to Three Rivers that have accrued and will continue to accrue during the pendency of the suspension.

68.     Additionally, Three Rivers estimates its lost profits relative to its participation in the Medicare Program to be in excess of $800,000.00 and rising.

69.     Three Rivers anticipates it will also likely be compelled to return monies already received from its participation in the Medicare Program to CMS in an amount to be determined.

70.     Moreover, as a consequence of MedAir's breach(es) of the parties' agreement, Three Rivers has incurred and will continue to incur attorney's fees, court costs and other expenses relative to the instant lawsuit and the ongoing CMS investigation.

**G. Three Rivers Relied to its Detriment Upon MedAir's Representations and Express Warranties**

71.     Three Rivers relied to its detriment upon MedAir's promise to properly scrub the final datasets for delivered test kits.

72.     Three Rivers relied to its detriment upon MedAir's promise to only include those beneficiaries who opted into the Medicare Program in the final datasets for final billing to Medicare.

73.     Deceased beneficiaries identified in the final datasets provided by MedAir did not opt into the Medicare Program.

74.     MedAir did not properly scrub the final datasets of any deceased beneficiaries before sending the same for final billing to Catalyst RCM.

11

75.     Upon knowledge, information and belief, MedAir failed to properly follow the program protocols developed by IMDS.

76.     MedAir therefore knew or should have known that the final datasets it provided for final billing to Catalyst RCM were not accurate.

77.     Three Rivers would not have agreed to participate in the Medicare Program collaboration but for MedAir's promise to properly scrub the final datasets of deceased and ineligible beneficiaries.

78.     Three Rivers would not have agreed to participate in the Medicare Program but for MedAir's promise to only include those beneficiaries in the final datasets who specifically opted into the Medicare Program.

**H. Three Rivers Signs a Written Agreement with MedAir Containing an Effective Date of December 23, 2022**

79.     Three Rivers signed a written Services Agreement with MedAir containing a stated effective date of December 23, 2022 in an attempt to memorialize the parties' ongoing relationship.

80.     MedAir represented to Three Rivers in the Services Agreement that it had the experience and resources necessary to effectively manage the logistics of and assist Three Rivers with its participation in the Medicare Program.

81.     The Services Agreement obligated MedAir to provide business and administrative services for the delivery of Covid-19 tests kits to eligible beneficiaries who opted into the Medicare Program on behalf of Three Rivers.

82.     A provision of the Services Agreement inaccurately states that it was Three Rivers' responsibility to provide MedAir with lists of eligible beneficiaries who elected to receive COVID-19 test kits under the Medicare Program.

83.     This provision of the Services Agreement is contrary to the parties' prior course of performance between early December, 2022 and December 22, 2022.

84.     Three Rivers never provided nor was responsible for providing datasets of eligible individuals who opted into the Medicare Program to MedAir during the parties' prior course of performance under their oral agreement.

85.     To the contrary, MedAir had already begun the initial outreach process to beneficiaries in November 2022, had a backlog of shipped COVID-19 test kits, and already had a dataset(s) of test kit recipients developed before MedAir met with Three Rivers for the first time in early December 2022.

86.     This provision of the Services Agreement is also contrary to the parties' course of performance from December 23, 2022 going forward.

87.     Never in the entire history of the parties' relationship was Three Rivers responsible for providing nor did Three Rivers ever supply or represent to MedAir that it was supplying a dataset(s) of eligible individuals who elected to receive COVID-19 test kits under the Medicare Program to MedAir.

88.     At all relevant times it was MedAir who in fact provided the final dataset(s) to Catalyst RCM for billing purposes.

89.     All relevant billing for the Medicare Program out of which the parties received reimbursement from CMS was the product of the final datasets provided by MedAir to Catalyst RCM.

90.     Every single COVID-19 test kit billed to Medicare and sent to a deceased beneficiary's last known address was the product of the datasets provided by MedAir to Catalyst RCM.

91.   Upon knowledge, information and belief, MedAir's counsel drafted the Services Agreement.

92.   The relevant provision of the Services Agreement is an inaccurate representation of the parties' roles relative to their participation in the Medicare Program.

93.   The parties' Services Agreement contains another provision wherein MedAir expressly represented and warranted, as an inducement for Three Rivers to enter into the Services Agreement, that neither MedAir nor any of its independent contractors, agents, employees or representatives is or has been suspended or sanctioned by Medicare, Medicaid or any other state or federal health care program.

94.   MedAir did not advise Three Rivers of Dr. Kedia's Medicare suspension due to MedAir's billing misconduct.

95.   Had Three Rivers known about MedAir's past misconduct relative to billing and participation in the Medicare Program through one of its principals, i.e, Dr. Kedia, Three Rivers would not have agreed to serve as MedAir's billing partner.

**COUNT 1 – BREACH OF CONTRACT**

96.   The allegations of paragraphs 1 through 95 above are hereby incorporated by reference as if fully set forth herein.

97.   MedAir offered to provide business and administrative services on Three Rivers' behalf in connection with the parties' collective participation in the Medicare Program in exchange for Three Rivers' return promise to permit billing under its PTAN and pay MedAir $85.68 per group of eight (8) COVID-19 test kits delivered to eligible beneficiaries.

98.   Three Rivers accepted MedAir's offer resulting in an oral agreement amongst the parties.

14

99.     The parties began performing under their oral agreement beginning on or about early December, 2022.

100.     MedAir subcontracted with its vendor IMDS who in turn provided MedAir a protocol designed to first ascertain eligible beneficiaries' desire to opt into the Medicare Program and second to scrub ineligible beneficiaries (including deceased beneficiaries) from the final datasets before ordering COVID-19 test kits and billing Medicare for delivery of the test kits to eligible beneficiaries.

101.     MedAir promised Three Rivers that the final datasets it would provide to Catalyst RCM for billing on Three Rivers' behalf would be properly scrubbed to remove ineligible beneficiaries, including but not limited to any deceased beneficiaries, and would only include those beneficiaries who specifically opted into the Medicare Program.

102.     MedAir breached its obligation under the parties' agreement to properly scrub the final datasets before billing.

103.     MedAir ordered and arranged for the delivery of COVID-19 test kits to at least 2,924 deceased beneficiaries between November 1, 2022 and January 24, 2023.

104.     MedAir provided final datasets to Catalyst RCM for final billing on behalf of Three Rivers that included the names of at least 2,924 deceased beneficiaries and the corresponding number of COVID-19 test kits delivered to these deceased beneficiaries.

105.     As a direct and proximate result of MedAir's breach(es) of the parties' agreement, Three Rivers has sustained significant pecuniary losses.

106.     MedAir's failure to perform as promised is the direct and proximate result of Three Rivers' February 2, 2023 suspension from Medicare reimbursement.

107.     Prior to its suspension, Three Rivers received annual payments from Medicare in excess of seven million dollars ($7,000,000.00) per year through its provision of lab services to Medicare beneficiaries, exclusive of its participation in the Medicare Program through the provision of COVID-19 test kits.

108.     Three Rivers' inability to receive reimbursement from Medicare for lab services to eligible beneficiaries has resulted in significant pecuniary damages to Three Rivers that have accrued and will continue to accrue during the pendency of its suspension.

109.     Additionally, Three Rivers estimates its lost profits relative to its participation in the Medicare Program to be in excess of $800,000.00 and rising.

110.     Three Rivers' lost profits were foreseeable at the time of contracting.

111.     Three Rivers anticipates it will also likely be compelled to return monies already received from its participation in the Medicare Program to CMS in an amount to be determined.

WHEREFORE, Three Rivers demands monetary damages against MedAir in excess of $75,000.00 and in an amount to be determined at trial, plus prejudgment interest at the applicable rate, compensatory damages, consequential damages and any further relief that this Honorable Court deems just and proper.

### COUNT 2 – INDEMNIFICATION

112.     The allegations of paragraphs 1 through 111 above are hereby incorporated by reference as if fully set forth herein.

113.     On December 23, 2022, the parties executed the Services Agreement.

114.     The Services Agreement contains an indemnity provision, which requires MedAir to indemnify and defend Three Rivers against any judgments, damages, costs,

16

fees and settlements in relation to claims brought by third parties and caused by *inter alia* a material breach of the Services Agreement.

115.    CMS is conducting an ongoing investigation into Three Rivers' billing practices during its participation in the Medicare Program between January 1, 2022 and January 24, 2023.

116.    CMS' investigation has cost and will continue to cost Three Rivers pecuniary harm in the form of attorneys' fees, costs, and related expenses.

117.    CMS' investigation may also result in a determination of overpayment, interest on any overpayment, litigation costs, and possible penalties.

118.    Pursuant to the Services Agreement, MedAir is obligated to indemnify Three Rivers for any such fees, costs, expenses, settlements and/or penalties that have arisen or may arise from CMS' ongoing investigation.

WHEREFORE, Three Rivers demands monetary damages against MedAir in excess of $75,000.00, plus prejudgment interest at the applicable rate, attorneys' fees and costs, and any further relief that this Honorable Court deems just and proper.

### COUNT 3 – FRAUD IN THE INDUCEMENT

119.    The allegations of paragraphs 1 through 118 above are hereby incorporated by reference as if fully set forth herein.

120.    MedAir represented it already had and/or would properly scrub the final datasets for delivered test kits consistent with its program plan.

121.    Three Rivers later discovered that the protocol for MedAir's program plan, which was represented to Three Rivers as being compliant with CMS requirements, was developed by MedAir's subcontractor, IMDS.

122. The IMDS protocol required MedAir to remove any deceased or otherwise ineligible beneficiaries from the final datasets.

123. MedAir represented it would only include those eligible beneficiaries who specifically opted into the Medicare Program in the final datasets for final billing to Medicare.

124. MedAir specifically represented to Three Rivers that the initial outreach process would involve phone calls to beneficiaries during which the beneficiaries had to affirmatively opt-into the Medicare Program to receive COVID-19 test kits.

125. As Three Rivers later discovered, the phone script used by MedAir and/or IMDS only gave beneficiaries the ability to opt-out of the Medicare Program but, if they failed to opt-out during the call, beneficiaries were automatically opted into the Medicare Program.

126. MedAir's representations are material to its agreement with Three Rivers.

127. MedAir ordered and arranged for the delivery of COVID-19 test kits to at least 2,924 deceased beneficiaries between November 1, 2022 and January 24, 2023.

128. MedAir provided final datasets to Catalyst RCM for final billing on behalf of Three Rivers that included the names of at least 2,924 deceased beneficiaries and the corresponding number of COVID-19 test kits delivered to these deceased beneficiaries.

129. Deceased beneficiaries identified in the final datasets provided by MedAir did not opt into the Medicare Program.

130. MedAir did not properly scrub the final datasets of any deceased beneficiaries before sending the same for final billing to Catalyst RCM.

131.   Upon knowledge, information and belief, MedAir failed to properly follow the program protocols developed by IMDS.

132.   MedAir therefore knew or should have known that the final datasets it provided for final billing to Catalyst RCM were not accurate.

133.   MedAir's representation that it would properly scrub the final datasets of ineligible and/or deceased beneficiaries prior to submitting the same for final billing was made falsely, with knowledge of its falsity or with reckless disregard as to whether the representation was true or false.

134.   This is especially true where MedAir had already begun the initial outreach process and developed datasets of test kit recipients relative to calls made to beneficiaries in the months of November 2022 and in early December 2022.

135.   MedAir developed a backlog of shipped COVID-19 test kits that were delivered to beneficiaries in the months of November 2022 and early December 2022, before MedAir met with Three Rivers for the first time.

136.   MedAir misrepresented to Three Rivers that proper protocols were followed to ensure compliance with CMS standards relative to the backlog of delivered COVID-19 test kits that MedAir needed to bill Medicare for through Three Rivers' assistance.

137.   MedAir misrepresented to Three Rivers that proper protocols would be followed going forward to ensure compliance with CMS standards for future deliveries of and billing for COVID-19 test kits.

138.   MedAir intended to mislead Three Rivers into relying upon its representation it had already and/or would properly scrub the final datasets of ineligible

beneficiaries, those beneficiaries who did not opt into the Medicare Program, and/or deceased beneficiaries.

139. Three Rivers justifiably relied upon MedAir's representations, because MedAir further represented that its program plan had been properly vetted by MedAir's counsel as being compliant with CMS requirements for proper Medicare reimbursement.

140. Three Rivers would not have agreed to participate in the Medicare Program collaboration but for MedAir's promise to properly implement the program plan by scrubbing the final datasets of deceased beneficiaries and by only including those beneficiaries who specifically opted into the program.

141. Similarly, the parties' Services Agreement contains a provision wherein MedAir expressly represented and warranted, as an inducement for Three Rivers to enter into the Services Agreement, that neither MedAir nor any of its independent contractors, agents, employees or representatives is or has been suspended or sanctioned by Medicare, Medicaid or any other state or federal health care program.

142. Dr. Kedia – i.e., one of MedAir's principals – is an employee, independent contractor, agent or representative of MedAir.

143. MedAir did not advise Three Rivers of Dr. Kedia's Medicare suspension due to MedAir's billing misconduct prior to or at the time of contracting.

144. Rather, MedAir misrepresented to Three Rivers that Dr. Kedia's family practice was under a "medical records review" because Doctor Kedia's family practice had such a small Medicare billing history.

145.   Had Three Rivers known about MedAir's past misconduct relative to billing and participation in the Medicare Program through one of its principals, i.e, Dr. Kedia, Three Rivers would not have agreed to serve as MedAir's billing partner.

146.   MedAir's representation that Dr. Kedia was merely under a "medical records review," when MedAir knew Dr. Kedia had been suspended from Medicare reimbursement as a consequence of MedAir's misconduct, was made falsely, with knowledge of its falsity or with reckless disregard as to whether the representation was true or false.

147.   MedAir intended to mislead Three Rivers so that MedAir could get around Dr. Kedia's suspension and begin receiving reimbursements again for its participation in the Medicare Program.

148.   Three Rivers justifiably relied upon MedAir's representations regarding Dr. Kedia's purported "medical records review," because MedAir further represented that its program plan had been properly vetted by MedAir's counsel as being compliant with CMS requirements for proper Medicare reimbursement.

149.   MedAir's fraudulent representations are the direct and proximate result of Three Rivers' February 2, 2023 suspension from Medicare reimbursement.

150.   Prior to its suspension, Three Rivers received annual payments from Medicare in excess of seven million dollars ($7,000,000.00) per year through its provision of lab services to Medicare beneficiaries, exclusive of its participation in the Medicare Program through the provision of COVID-19 test kits.

151.   Three Rivers' inability to receive reimbursement from Medicare for lab services to eligible beneficiaries has resulted in significant pecuniary damages to Three

Rivers that have accrued and will continue to accrue during the pendency of its suspension.

152.     Additionally, Three Rivers estimates its lost profits relative to its participation in the Medicare Program to be in excess of $800,000.00 and rising.

153.     Three Rivers' lost profits were foreseeable at the time of contracting.

154.     Three Rivers anticipates it will also likely be compelled to return monies already received from its participation in the Medicare Program to CMS in an amount to be determined.

WHEREFORE, Three Rivers demands monetary damages against MedAir in excess of $75,000.00 and in an amount to be determined at trial, plus prejudgment interest at the applicable rate, compensatory damages, consequential damages and any further relief that this Honorable Court deems just and proper.

### COUNT 4 – UNJUST ENRICHMENT/QUANTUM MERUIT – AGAINST MEDAIR LABS, LLC

155.     The allegations of paragraphs 1 through 154 above are hereby incorporated by reference as if fully set forth herein.

156.     Alternatively, in the event it is determined that a valid contract did not exist at the relevant time between Three Rivers and MedAir, Three Rivers seeks restitution under either a theory of unjust enrichment or quantum meruit, dependent upon the applicable burden of proof at trial.

157.     Three Rivers conferred a valuable service and/or benefit upon MedAir: (A) where Three Rivers agreed to permit billing under its PTAN for each COVID-19 test kit procured and delivered by MedAir to eligible beneficiaries, and (B) where Three Rivers paid MedAir $85.68 per group of eight (8) test kits so delivered.

22

158.     MedAir appreciated and retained the value of the benefit conferred and/or the value of Three Rivers' services provided through MedAir's receipt of $85.68 per group of eight (8) test kits procured and delivered to eligible beneficiaries.

159.     MedAir's failure to scrub the final datasets of deceased beneficiaries as promised and/or MedAir's failure to ensure that only those beneficiaries who specifically opted into the Medicare Program would be included in the final datasets directly resulted in Three Rivers' suspension from Medicare reimbursement and, therefore, it would be unjust for MedAir to retain the value of the services provided and/or benefit conferred in the context of its arms-length relationship with Three Rivers.

WHEREFORE, Three Rivers demands monetary damages against MedAir in excess of $75,000.00 and in an amount to be determined at trial, plus prejudgment interest at the applicable rate, and any further relief that this Honorable Court deems just and proper.

## COUNT 5 – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

160.     The allegations of paragraphs 1 through 159 above are hereby incorporated by reference as if fully set forth herein.

161.     Prior to entering into their own agreement, Three Rivers and MedAir had thorough discussions regarding their potential collaboration and participation in the Medicare Program.

162.     MedAir knew that Three Rivers was a party to separate Medicare provider agreements with CMS.

163.     Three Rivers specifically advised MedAir that Three Rivers' participation in the Medicare Program needed to be compliant with CMS' requirements for program

23

participation, billing and reimbursement pursuant to the terms of Three Rivers' Medicare provider agreement.

164.    MedAir knew, prior to contracting, that Three Rivers' failure to comply with its Medicare provider agreement could result in a suspension from receiving Medicare payments.

165.    MedAir assured Three Rivers that the business and administrative services it proposed to offer satisfied CMS standards but further represented MedAir needed a laboratory partner (like Three Rivers) as the billing party in order to execute MedAir's program plan as MedAir is not an entity that has a Provider Transaction Access Number ("PTAN") to bill Medicare..

166.    MedAir failed to follow IMDS's and/or any proper screening protocols.

167.    MedAir provided final datasets to Catalyst RCM for final billing on behalf of Three Rivers that included the names of at least 2,924 deceased beneficiaries and the corresponding number of COVID-19 test kits delivered to these deceased beneficiaries.

168.    MedAir's failure to follow IMDS' and/or any proper screening protocols was purposeful and specifically intended to harm Three Rivers' contractual relationship with CMS.

169.    MedAir's failure to follow IMDS' and/or any proper screening protocols demonstrates MedAir's reckless indifference to the interests of Three Rivers – i.e., a Medicare provider that heretofore received annual payments from Medicare in excess of seven million dollars ($7,000,000.00) per year through its provision of lab services to Medicare beneficiaries.

170.    MedAir knew that, by failing to properly screen the test kit recipient lists, it was very likely providing final datasets for billing which included deceased beneficiaries, ineligible beneficiaries, and/or beneficiaries who did not opt into the Medicare program.

171.    MedAir knew that by providing fraudulent datasets to Three Rivers it was putting Three Rivers' Medicare provider agreement with CMS at risk.

172.    MedAir knew that its program plan did not satisfy CMS standards as evidenced by Dr. Kedia's Medicare suspension, which was not disclosed to Three Rivers.

173.    MedAir's conduct in this regard is not privileged or justified.

174.    As a result of MedAir's tortious conduct, Three Rivers was suspended on or about February 2, 2023 from receiving future Medicare payments.

175.    Prior to its suspension, Three Rivers received annual payments from Medicare in excess of seven million dollars ($7,000,000.00) per year through its provision of lab services to Medicare beneficiaries, exclusive of its participation in the Medicare Program through the provision of COVID-19 test kits.

176.    Three Rivers' inability to receive reimbursement from Medicare for lab services to eligible beneficiaries has resulted in significant pecuniary damages to Three Rivers that have accrued and will continue to accrue during the pendency of its suspension.

177.    Additionally, Three Rivers estimates its lost profits relative to its participation in the Medicare Program to be in excess of $800,000.00 and rising.

178.   Three Rivers anticipates it will also likely be compelled to return monies already received from its participation in the Medicare Program to CMS in an amount to be determined.

179.   Three Rivers seeks both compensatory and consequential damages due to MedAir's interference with Three Rivers' contractual relationship with CMS.

WHEREFORE, Three Rivers demands monetary damages against MedAir in excess of $75,000.00 and in an amount to be determined at trial, plus prejudgment interest at the applicable rate, compensatory damages, consequential damages, punitive damages and any further relief that this Honorable Court deems just and proper.

## COUNT 6 – FRAUD

180.   The allegations of paragraphs 1 through 179 above are hereby incorporated by reference as if fully set forth herein.

181.   MedAir assured Three Rivers that the business and administrative services it proposed to offer satisfied CMS standards but further represented MedAir needed a laboratory partner (like Three Rivers) as the billing party in order to execute MedAir's program plan as MedAir is not an entity that has a Provider Transaction Access Number ("PTAN") to bill Medicare.

182.   Prior to working with Three Rivers, MedAir had billed for its participation in the Medicare program through their principal's (i.e., A. William Kedia, MD or "Doctor Kedia") family practice.

183.   MedAir misrepresented to Three Rivers that Doctor Kedia's practice was put on a "medical record review," because Doctor Kedia's family practice had such a small Medicare billing history.

184.    In reality, Doctor Kedia's family practice was suspended from receiving reimbursements from Medicare due to MedAir's billing misconduct and, therefore, MedAir needed a laboratory partner like Three Rivers to get around this suspension.

185.    MedAir knew that its program plan was not compliant due to the prior suspension it caused using Doctor Kedia's PTAN.

186.    Nonetheless, MedAir further represented that its program plan had been properly vetted by its legal counsel as compliant with CMS billing requirements.

187.    MedAir's misrepresentations were material to the parties' decision to collaboratively participate in the Medicare Program.

188.    MedAir's misrepresentations were made with knowledge of their falsity or with reckless disregard as to whether the representations were true or false.

189.    MedAir's misrepresentations were made with the intent to mislead Three Rivers into relying upon them, because MedAir needed a new PTAN to bill under for the Medicare Program.

190.    Three Rivers justifiably relied upon MedAir's representations given the recommendations of Catalyst RCM and Chad Walker and given MedAir's specific assurances that the program plan was properly vetted by counsel.

191.    MedAir's misrepresentations are the direct and proximate result of Three Rivers' February 2, 2023 suspension from Medicare reimbursement.

192.    Prior to its suspension, Three Rivers received annual payments from Medicare in excess of seven million dollars ($7,000,000.00) per year through its provision of lab services to Medicare beneficiaries.

193.    Three Rivers' inability to receive reimbursement from Medicare for lab services to eligible beneficiaries has resulted in significant pecuniary damages to Three Rivers that have accrued and will continue to accrue during the pendency of its suspension.

194.    Three Rivers anticipates it will also likely be compelled to return monies already received from its participation in the Medicare Program to CMS in an amount to be determined.

WHEREFORE, Three Rivers demands monetary damages against MedAir in excess of $75,000.00 and in an amount to be determined at trial, plus prejudgment interest at the applicable rate, punitive damages and any further relief that this Honorable Court deems just and proper.


Dated: June 28, 2023                          Respectfully submitted,

                                              BURNS WHITE LLC

                                              By: _____
                                                  Mary Jo Rebelo, Esquire
                                                  PA ID No. 53539
                                                  mjrebelo@burnswhite.com
                                                        and
                                                  Kenneth N. Schott III, Esquire
                                                  PA ID No. 320716
                                                  knschott@burnswhite.com

                                              **BURNS WHITE LLC**
                                              Burns White Center
                                              48 26th Street
                                              Pittsburgh, PA  15222
                                              (412) 995-3000
                                              *Counsel for Plaintiff Qualitox Laboratories, LLC dba Three Rivers Diagnostics*

28